# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

MICHAEL DURLAND, KATHLEEN FENNELL, and DEER HARBOR BOATWORKS,

Appellants,

v.

SAN JUAN COUNTY, WES HEINMILLER, and ALAN STAMEISEN,

Respondents.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 67429-3-I

ORDER DENYING RESPONDENTS' MOTION FOR RECONSIDERATION AND AMENDING THE UNPUBLISHED OPINION

Respondents Wes Heinmiller and Alan Stameisen filed a motion for reconsideration of the unpublished opinion filed in the above matter on October 30, 2012. A majority of the panel has determined this motion should to be denied, but the opinion should be amended.

Now, therefore, it is hereby

ORDERED that respondents' motion for reconsideration is denied and the unpublished opinion shall be amended by deleting footnote 13 on page 16. The deleted footnote reads as follows:

[13]We do not suggest that a compliance plan can never be a final determination. We hold only that the compliance plans in this case do not bear the indicia of a final land use decision as described in Samuel's Furniture, 147 Wn.2d at 452.

The remainder of the opinion is unchanged.

DATED this 22nd day of January 2013.

2013 JAN 22 PM 2:05 COURT OF APPEALS DIV I STATE OF WASHINGTON FILED

# IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| MICHAEL DURLAND, KATHLEEN FENNELL, and DEER HARBOR BOATWORKS, | ) ) ) ) | No. 67429-3-I |
| Appellants, | ) ) | DIVISION ONE |
| v. | ) ) | |
| SAN JUAN COUNTY, WES HEINMILLER, and ALAN STAMEISEN, | ) ) ) | UNPUBLISHED OPINION |
| Respondents. | ) ) | FILED: <u>October 29, 2012</u> |

SPEARMAN, A.C.J. — Under the Land Use Petition Act, chapter 36.70C RCW (LUPA), a petition challenging a land use decision must be filed within 21 days of the issuance of the land use decision. Furthermore, a party may not collaterally challenge a land use decision for which the appeal period has passed through a challenge to a subsequent land use decision. The main question presented in this appeal is whether compliance plans between respondent San Juan County and respondents Wesley Heinmiller and Alan Stameisen (Heinmiller and Stameisen referred to collectively as "Heinmiller") were "land use decisions" under LUPA. If they were, the appellants, Michael Durland, Kathleen Fennel, and Deer Harbor Boatworks (collectively, "Durland"), are barred from raising certain issues in their LUPA petition because they did not bring a LUPA petition challenging the compliance plans within 21 days. Other issues on appeal and cross-appeal are whether the County properly calculated the pitch for a proposed

roof on Heinmiller's barn; whether the County properly calculated the "living area" of an alternative dwelling unit (ADU) constructed inside the barn; and whether the superior court erred in awarding statutory costs to Durland.

We hold that the compliance plans in this case were not land use decisions because they were not final determinations that left nothing open to further dispute. We also hold that while the County did not err in calculating roof pitch because the relevant code provision did not specify how to measure pitch, the County did err in calculating living area because the relevant code provisions were not ambiguous and did not allow for exclusion of areas with a ceiling height below five feet. We find no abuse of discretion in the award of statutory costs to Durland.

## FACTS

Durland owns property in Deer Harbor on Orcas Island, in San Juan County, which is currently used as a boat yard and marina. Heinmiller's predecessor-in-interest, William G. Smith, owned the property adjacent to and south of the Durland property ("Heinmiller property"). In 1981, the County issued a building permit for a storage barn to Smith. The permit approved a barn that was to be built ten feet from the property line shared with the Durland property.[1] A barn was constructed that year. In 1990, Durland sought a conditional use permit and a shoreline permit. A property line survey revealed that the barn on

---

[1] San Juan County Resolution No. 224, in effect at that time, required the barn to be at least ten feet away from the property line.

2

the Heinmiller property was in fact located only 1.4 feet from the property line. To address this issue, Durland and Smith executed a "Boundary Line Agreement and Easement" that prevented Durland from building within 20 feet of the barn.[2]

Around 1995, Heinmiller purchased the property from Smith. In 1997, he converted a portion of the barn to an ADU but did not secure any building or shoreline permits for this work, in violation of San Juan County Code (SJCC) requirements. In 2008, Heinmiller filed an application for an upland conditional use permit seeking authorization to use the ADU as a vacation rental unit. Because of the application, the County became aware of the ADU conversion. In February 2008, the County issued a "notice of correction" to Heinmiller, requiring the ADU to be demolished.[3]

Heinmiller negotiated with the County regarding the notice of correction. The County agreed to allow him to seek after-the-fact permits for the ADU before requiring demolition. Accordingly, on April 25, 2008, Heinmiller and the County executed an agreed compliance plan ("compliance plan"). The compliance plan included a section titled "Correction of Violations and Compliance Schedule" that outlined what actions were necessary to bring the property into compliance with

---

[2] The agreement established a common boundary line and, because the new line did not correct the barn's location with respect to setback requirements, created a 20-foot-wide "easement" (actually a restrictive covenant) on Durland's property that terminated upon the removal or destruction of the barn. Durland agreed to the restrictive covenant because he saw a benefit from the barn, which provided a buffer between his industrial property and any residential uses on the far side of the barn. He did not, however, want the barn to be used for residential purposes for fear of conflicts with the industrial use of his property.

[3] The notice of correction is not in the record. The County hearing examiner's opinion indicates that before the compliance plans were entered into, the County required the ADU to be destroyed.

the SJCC. It also stated, in the "Background" section, that the County recognized that the private restrictive covenant brought the barn into conformance with the ten-foot setback requirement that applied when the barn was constructed.

One year later, on April 28, 2009, the County and Heinmiller executed a supplemental agreed compliance plan ("supplemental compliance plan"; both plans will be referred to collectively as "compliance plans"). The supplemental compliance plan stated that Heinmiller could avoid the need for a shoreline substantial development permit and a conditional use permit if certain steps were taken, including reducing the height of the barn to 16 feet.[4] Heinmiller planned to reduce the height of the barn by reconfiguring the peak of the gable roof to create a flat portion.

On June 4, 2009, Durland filed an administrative appeal of the supplemental compliance plan with the County. In a June 8, 2009 letter to Durland, the county planning director wrote:

> I write to inform you that there is no administrative appeal process for a neighbor to challenge a Compliance Plan or Amended Compliance Plan. A Compliance Plan is a code enforcement tool that is available to the Administrator to assure compliance with the County Code and is authorized by SJCC 18.100.040(d). Code Enforcement is a matter between the County and the offender and is not subject to administrative appeal by a neighbor.

Clerk's Papers (CP) at 3-4. On August 13, 2009, the County hearing examiner dismissed Durland's appeal on the basis that it was filed one day late.

---

[4] SJCC 18.50.330(E) exempts certain structures from shoreline permitting requirements if the structure is no taller than 16 feet.

4

No. 67429-3-I/5

Heinmiller applied for a building permit, change-of-use permit, and ADU permit as contemplated by the compliance plans.[5] The County approved the permits on November 23 and 24, 2009. On December 11, Durland filed an administrative appeal challenging the permits. He raised the following issues:

1. Whether the permits are consistent with regulations regarding land developed in violation of local regulations.
2. Whether the barn complies with setback requirements.
3. Whether the barn complies with building width limitations for properties with shoreline frontage.
4. Whether the barn complies with waterfront setback requirements for accessory structures.
5. Whether the appropriate shoreline approvals, such as a shoreline conditional use permit, substantial development permit, or shoreline exemption have been obtained.
6. Whether the ADU complies with the living area limitation of 1,000 square feet.
7. Whether the barn complies with roof pitch requirements in the Deer Harbor Hamlet Plan.

See CP at 68-69.

The County hearing examiner considered Durland's appeal at an evidentiary hearing on May 6, 2010. The hearing examiner determined that the compliance plans were land use decisions subject to LUPA's requirement that appeals be filed within 21 days of issuance. He concluded the compliance plans had resolved certain issues that were now time-barred and could not be raised in an appeal of the permits. With respect to the ADU permit, however, he concluded

---

[5] Durland contends he actively participated in the County's review process for these three permits, but his citations to the record do not show participation during the review process. The record reflects that on October 6, 2007, Durland sent an email to SJC Community Development and Planning raising various concerns about Heinmiller's ADU application, but this was well before the date of the compliance plans. Also, in Durland's notice of appeal to the hearing examiner, he stated that "[a]ppellants have participated in the administrative review process leading up to issuance of the challenged permits." CP at 68. The record is unclear as to the nature and extent of Durland's participation in the permit review process.

5

that the compliance plans "do not substitute for ADU review and approval" and addressed the living area issue on the merits. He found that the ADU complied with the 1,000-square-foot living area limit set forth in the SJCC, reasoning that "living area" did not include spaces where the ceiling height was less than five feet. As for whether the barn complied with roof pitch requirements, the hearing examiner concluded:

> As noted in the current version of the Deer Harbor Hamlet Plan (adopted 2007), specific regulations for the Deer Harbor area were only first put together in 1999, which was well after the building was constructed in 1981. The pitch requirement referenced by the appellant . . . was adopted in 2007. As a nonconforming use, the subsequently enacted Deer Harbor roof pitch requirements do not apply.

CP at 32.

Durland appealed the hearing examiner's decision by filing a LUPA petition in Skagit County Superior Court on August 13, 2010. The court concluded that the compliance plans were land use decisions under LUPA and that Durland's challenge to the permits largely amounted to a collateral attack on the compliance plans. The court dismissed any issues resolved by the compliance plans. After a hearing on the merits, the court upheld the hearing examiner's decision on the roof pitch issue. It reasoned that the SJCC provides no guidelines for calculating pitch for a variable-pitch roof and that the 4:12 pitch requirement was susceptible to more than one interpretation, such that deference would be given to the County's interpretation. The court reversed the hearing examiner's computation of the ADU's living area, reasoning that the SJCC

6

No. 67429-3-I/7

definition of "living area" was unambiguous and did not allow for exclusion of areas with a ceiling height less than five feet. It remanded the ADU permit for further consideration of that issue and awarded statutory costs to Durland.

Durland now appeals the superior court's ruling that the issues in the compliance plans were time-barred under LUPA[6] and its ruling as to the barn's roof pitch. Heinmiller cross-appeals the superior court's ruling regarding the living area of the ADU and the court's award of statutory costs to Durland.[7]

DISCUSSION

*Standard of Review*

LUPA, chapter 36.70C RCW, governs judicial review of land use decisions in Washington. RCW 36.70C.030. When conducting judicial review under LUPA, this court sits in the same position as the superior court. Griffin v. Thurston County, 165 Wn.2d 50, 54-55, 196 P.3d 141 (2008). We review the administrative record before the hearing examiner, the "local jurisdiction's body

_____

[6] Durland also contends the hearing examiner erred in concluding that his appeal was time-barred under LUPA because the "decision is outside the authority or jurisdiction of the body or officer making the decision." RCW 36.70C.130(1)(e). We agree. The hearing examiner determined that the compliance plan agreements were a land use decision under LUPA and that Durland's appeal was filed more than 21 days after the compliance plan agreements were executed. Thus, the hearing examiner concluded the appeal was time-barred under RCW 36.70C.040(3). But the hearing examiner's authority is limited to that granted by the creating body. Chausee v. Snohomish County Council, 38 Wn. App. 630, 636, 689 P.2d 1084 (1984). Here, SJCC 2.22.030 limits the hearing examiner's authority to consideration of "land use regulations as provided by ordinance." SJCC 2.22.100 sets forth the specific land use regulations the hearing examiner is authorized to consider. Whether a decision is a land use decision under LUPA is not among them. The resolution of this issue is reserved to the superior court. Nonetheless, as Durland concedes, the issue is properly before us because the issue was considered by the superior court.

[7] The County submits briefing in support of Heinmiller's position as to the LUPA issue but takes no position regarding the roof pitch or living area issues. For convenience, and because they make substantially the same arguments, the County's arguments will be attributed to Heinmiller when discussing the LUPA issue.

7

or officer with the highest level of authority to make the determination . . . ." RCW 36.70C.020(2). Relief is granted only if the party seeking relief establishes that the hearing examiner erred under one of the six standards in RCW 36.70C.130(1). The following standards are relevant to our determination of the LUPA issue, roof pitch issue, and living area issue:

> (b) The land use decision is an erroneous interpretation of the law, after allowing for such deference as is due the construction of a law by a local jurisdiction with expertise;
>
> (c) The land use decision is not supported by evidence that is substantial when viewed in light of the whole record before the court;[8]
>
> (d) The land use decision is a clearly erroneous application of the law to the facts;
>
> (e) The land use decision is outside the authority or jurisdiction of the body or officer making the decision;

RCW 36.70C.130(1). An appellate court "must give substantial deference to both the legal and factual determinations of a hearing examiner as the local authority with expertise in land use regulations." Lanzce G. Douglass, Inc. v. City of Spokane Valley, 154 Wn. App. 408, 415-16, 225 P.3d 448 (2010), rev. denied, 169 Wn.2d 1014 (2010) (citation omitted).

---

[8] Under the substantial evidence standard, "there must be a sufficient quantum of evidence in the record to persuade a reasonable person that the declared premise is true." Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 176, 4 P.3d 123 (2000).

No. 67429-3-I/9

*Compliance Plans as Land Use Decisions*

The first issue is whether the compliance plans between the County and

Heinmiller were land use decisions under LUPA. A "land use decision" is defined

under LUPA as:

> a <u>final determination</u> by a local jurisdiction's body or officer with the highest level of authority to make the determination, including those with authority to hear appeals, on:
>
> (a) An application for a project permit or other governmental approval required by law before real property may be improved, developed, modified, sold, transferred, or used, but excluding applications for permits or approvals to use, vacate, or transfer streets, parks, and similar types of public property; excluding applications for legislative approvals such as area-wide rezones and annexations; and excluding applications for business licenses;
>
> (b) An interpretative or declaratory decision regarding the application to a specific property of zoning or other ordinances or rules regulating the improvement, development, modification, maintenance, or use of real property; and
>
> (c) The enforcement by a local jurisdiction of ordinances regulating the improvement, development, modification, maintenance, or use of real property. . . .

RCW 36.70C.020(2) (Emphasis added).

A petition to review a land use decision is barred under LUPA unless it is

filed within 21 days of the issuance of the land use decision.[9] RCW

36.70C.040(3). Furthermore, a party may not collaterally challenge a land use

decision for which the appeal period has passed via a challenge to a subsequent

---

[9] It is not clear when the compliance plans were "issued" within the meaning of RCW 36.70C.040(4). However, the parties do not dispute that the 21-day appeal period for the compliance plans, if such a period applied, had passed before Durland filed his appeal of the permits.

9

land use decision. Habitat Watch v. Skagit County, 155 Wn.2d 397, 410-11, 120 P.3d 56 (2005) (challenge to grading permit amounted to untimely collateral attack of earlier special use permit, where authorization for grading permit came from special use permit, whose appeal period had passed, and where sole basis for challenging grading permit was that extensions of special use permit were improper); Wenatchee Sportsmen Ass'n v. Chelan County, 141 Wn.2d 169, 180-82, 4 P.3d 123 (2000) (challenge to county's approval of plat application based on challenge to density of plat was untimely collateral attack where petitioner had not challenged rezone decision establishing allowed density for project two years earlier). Because LUPA prevents a court from reviewing an untimely petition, a land use decision becomes valid once the opportunity to challenge has passed. Wenatchee Sportsmen Ass'n, 141 Wn.2d at 181.

A land use decision is "final" for purposes of LUPA when it "leaves nothing open to further dispute" and "sets at rest [the] cause of action between the parties." Samuel's Furniture, Inc. v. State, Dep't of Ecology, 147 Wn.2d 440, 452, 54 P.3d 1194 (2002). A final decision "'concludes the action by resolving the plaintiff's entitlement to the requested relief.'" Id. (quoting Purse Seine Vessel Owners v. State, 92 Wn. App. 381, 387, 966 P.2d 928 (1998)). In contrast, an interlocutory decision intervenes between the commencement and the end of a suit and decides some point or matter, but is not a final decision of the whole controversy. Id.

Furthermore, a final land use decision should memorialize the terms of the decision, not simply reference them, in a tangible and accessible way so that a diligent citizen may "know whether the decision is objectionable or, if it is, whether there is a viable basis for a challenge." Vogel v. City of Richland, 161 Wn. App. 770, 779-80, 255 P.3d 805 (2011). It must be clear to a reviewing court what decision is presented for review. Id. at 780. Mere decisions about the process to be followed in making a land use decision are not final land use decisions. Id. at 778-79. And where a local jurisdiction sets forth a process for making a land use decision, the land use decision is not final unless the jurisdiction has complied with the process and the entire process is complete. See Heller Bldg., LLC (HBC) v. City of Bellevue, 147 Wn. App. 46, 55-56, 194 P.3d 264 (2008) (stop work order not final land use decision where it did not contain information required by city code, which would have informed landowner HBL of substance of violations in a way that would allow HBL to correct violation or make informed decision whether to challenge city's decision); WCHS, Inc. v. City of Lynnwood, 120 Wn. App. 668, 679-80, 86 P.3d 1169 (2004) (letters from city to landowner not final land use decisions because, among other reasons, they did not comply with city's own code requirements for distributing notice of decisions).

Applying these principles, we hold that the compliance plans in this case were not a "final determination," and therefore not land use decisions.[10] First, the plans outline at least two possible courses of action and do not "set at rest" the cause of action, Samuel's Furniture, 147 Wn.2d at 452. What Heinmiller sought in negotiating with the County over the notice of correction was to maintain the ADU. But the compliance plans do not guarantee that he could do so. To illustrate, the "Correction of Violations and Compliance Schedule" section of the compliance plan provides, in full:

> The parties agree that the owners are required to take the following action to bring the property into compliance with the County Code:
>
> 1. Immediately cease all use of the storage structure for habitable purposes.
> 2. Submit a complete demolition permit for removal of the deck and carport no later than May 1, 2008. Remove the deck and carport no later than 45 days after issuance of the demolition permit.[11]
> 3. The owners will take EITHER action (a) or (b) as follows:
>    a. Submit necessary permit applications for conversion of a portion of the storage structure to an ADU or bunkhouse. The first step is submittal of complete Shoreline Substantial Development Permit and Conditional Use Permit applications, which will be submitted no later than June 21, 2008. The owners' next step is as follows:
>       i. If the SDP and CUP are approved, the owners will submit complete applications for all other necessary land use approvals such as building permits within 45 days of the approval of the SDP and CUP. The owners will take

---

[10] That the compliance plans were not a land use decision as to the setback issue specifically is consistent with the fact that, when Durland requested a document showing a "Land Use Decision by the County recognizing the barn as a non-conforming structure," which Heinmiller now asserts the compliance plans did, the deputy prosecuting attorney responded in July 2008, "No land use decision 'recognized' the barn as a non-conforming structure or changed it to a non-conforming structure.'" CP at 180.

[11] The demolition of the deck, carport, and other alterations are not at issue in this case.

action to promptly complete construction and finalize the permits.

ii. If either the SDP or CUP are denied, the owners will either (A): obtain a demolition permit for removal of the converted space inside the storage structure within 60 days and restore the structure to its permitted configuration for storage no later than 45 days from demolition permit issuance; or (B) identify an alternative method of compliance within 60 days with the agreement of the County.

b. Submit a complete demolition permit application for removal of the converted space inside the storage structure no later than June 21, 2008, and restore the structure to its permitted configuration for storage no later than 45 days from demolition permit issuance.

4. Submit complete permit applications no later than June 21, 2008 for the installation or removal of any other alterations of the storage structure which have occurred without the necessary building, electrical, mechanical, or plumbing permits and which are not addressed by a permit application submitted to comply with item (2) or (3) above. These alterations include but are not limited to the addition of exterior siding, extended eaves, heat, plumbing, and windows.

CP at 81-82. As this language shows, the compliance plan did not determine the course of action between Heinmiller and the County with certainty. As far as such language indicated, there was nothing for Durland to appeal at that time. Significantly, one of the courses of action contemplated by the compliance plans–demolition of the ADU–was entirely satisfactory to Durland. It would have been premature, then, for him to bring a LUPA petition appealing the compliance plans when it was not apparent that Heinmiller would proceed in an objectionable manner. Furthermore, under section 3(a)(ii)(B), the compliance plan contemplated the possibility of an unknown course of action within 60 days if the shoreline permit or conditional use permit were denied. Requiring Durland to

appeal the compliance plans (and what was purportedly decided by them) within 21 days, when Heinmiller had 60 days to pursue a third course not even described by them, would be illogical.

Next, the compliance plan did not leave "nothing open to further dispute." Samuel's Furniture, 147 Wn.2d at 452. When Heinmiller approached the County a year after the compliance plan to propose a change, they agreed to a supplemental compliance plan. This confirms that the initial plan was not a final determination of Heinmiller's rights or obligations. The supplemental plan proposed "an alternative method of legalizing the ADU." CP at 83. Specifically, Heinmiller proposed obtaining a building permit that would allow remodeling a portion of the barn to an ADU and reducing the height of the barn to 16 feet, which "would not require either a shoreline substantial development permit or a conditional use permit." Id. The supplemental plan stated:

> The changes to the Agreed Compliance Plan are as follows:
>
> The parties agree that the owners may take the following action as an alternative to Correction of Violations and Compliance Schedule Action #3 as listed in the Agreed Compliance Plan dated April 25, 2008:
>
> Submit a complete building permit application by July 6, 2009, for the remodeling and conversion of a portion of the storage structure to an ADU and reduction in the height of the structure to no more than 16 feet above existing grade as measured along a plumb line at any point. Height shall be determined in accordance with the interpretation entitled "Height of Accessory Use Shoreline Structures" issued by Rene Beliveau on September 18, 2008. The owners will take action to promptly complete construction and finalize all permits to obtain legal occupancy of the structure.

14

CP at 84. The supplemental plan concluded, "All provisions in the underlying Agreement shall remain in effect except as expressly modified by this supplement." Id. The compliance plan was modified by the supplemental compliance plan one year later and was evidently not final and binding on Heinmiller.

Heinmiller asserts that the determination of whether the permits were authorized by the SJCC was made in the earlier compliance plans and could not be attacked collaterally when the permits were issued. But the compliance plans did not determine that the permits would be issued; they only stated that if the permits were obtained, the property would be brought into compliance with the SJCC. They implicitly acknowledge that the permits might not be granted and that one of the permits that might be issued is a demolition permit.

Heinmiller also contends that permitting collateral challenges to compliance plans would eliminate their usefulness as code enforcement tools because they would provide no certainty, eliminating their benefits.[12] But the plans in this case do not provide the certainty that Heinmiller claims; they do not

---

[12] Heinmiller points out that encouraging the voluntary correction of violations is a primary intent behind enforcement actions under SJCC 18.100.010. Development of compliance plans is one method for achieving compliance with the SJCC. If such a plan is developed, the SJCC states that no further code enforcement action will be taken:

> Following a notice of violation, the administrator and person in violation may develop a mutually agreeable compliance plan. The compliance plan shall establish a reasonable and specific time frame for compliance. No further action will be taken if the terms of the compliance plan are met. If no compliance plan is established, enforcement of the violation will proceed.

SJCC 18.100.040(D).

state that any of the named permits will be granted or that he will ultimately be able to maintain the ADU.[13]

Heinmiller further argues that the compliance plans are a final determination because the County complied with the process for compliance plans, the compliance plans contained the elements required by the SJCC, and the process was complete because there was no administrative appeal available. While these may be necessary to find a final determination under Heller Bldg and WCHS, these cases do not say that these circumstances are sufficient for a final decision.

We hold the compliance plans were not land use decisions and Durland's failure to file a LUPA petition regarding the compliance plans did not bar him from raising certain issues in his LUPA petition regarding the permits.[14]

*Roof's Compliance with SJCC Pitch Requirement*

Durland contends the hearing examiner erroneously approved a building permit because the modification to the barn's roof would violate roof pitch requirements. He argues the roof pitch regulation is unambiguous and the

---

[13] We do not suggest that a compliance plan can never be a final determination. We hold only that the compliance plans in this case do not bear the indicia of a final land use decision as described in Samuel's Furniture, 147 Wn.2d at 452.

[14] We decline Durland's invitation to decide the setback issue, which was not reached by the hearing examiner or the superior court. This issue involves Durland's argument that the County could not issue permits for the ADU conversion because the barn was an illegal structure by virtue of the fact that it did not comply with the ten-foot setback requirement under the original 1981 building permit or then-existing SJCC provisions. He requests this court to rule that (1) the barn was built illegally; (2) the illegality was not cured by the private restrictive covenant; and (3) therefore, permits could not be issued to modify the barn until the illegality was cured, under SJCC 18.100.030(F) and SJCC 18.100.070(D). This issue should be considered by the hearing examiner with the other issues on remand.

County had no authority to construe it. He contends the County's approach in excluding the flat portion of the roof by measuring from the outside edge of the flat portion of the roof (not from the center of the roof) was not authorized by the SJCC.

We hold that the result reached by the hearing examiner on this issue was not an erroneous interpretation of the law or a clearly erroneous application of the law to the facts, and was supported by evidence that is substantial when viewed in light of the whole record before the court.[15] See RCW 36.70C.130(1). Though we agree with Durland that the roof pitch requirement under the code provision is unambiguous, stating a minimum pitch of 4:12, the provision sets forth no guidelines or methodology for calculating pitch.[16] Nor does it require a particular type of roof. The roof pitch provision is ambiguous as to how to measure the pitch of the proposed roof in this case and is subject to more than one interpretation, such that we give the County's interpretation deference. See Bostain v. Food Express, Inc., 159 Wn.2d 700, 716, 153 P.3d 846 (2007) (courts accord deference to agency's interpretation where (1) agency is charged with administration and enforcement of statute, (2) statute is ambiguous, and (3) statute falls within agency's special expertise); Citizens For A Safe Neighborhood

---

[15] The hearing examiner decided this issue by ruling that the Deer Harbor roof pitch requirements adopted in 2007 did not apply to the building because it was constructed in 1981 and was therefore a grandfathered nonconforming use. The superior court affirmed, but on the ground that the County's interpretation would be given deference. We agree with the superior court and affirm the hearing examiner's ruling on that basis

[16] SJCC 18.30.350(H) provides: Roof Pitch. The minimum permitted roof pitch in Deer Harbor is 4:12. The relevant portion of SJCC 18.30.320, Table 3.9, states: "Minimum Roof Pitch - 4:12." A flat roof has a pitch of 0:12.

v. City of Seattle, 67 Wn. App. 436, 440, 836 P.2d 235 (1992) "It is a well established rule of statutory construction that considerable judicial deference should be given to the construction of an ordinance by those officials charged with its enforcement.") (quoting Keller v. Bellingham, 92 Wn.2d 726, 731, 600 P.2d 1276 (1979)).

Here, the County determined that the pitch of the proposed roof measured 4:12. Associate planner Lee McEnery performed calculations using the building plans and a scale. She measured from the outside edge of the flat area of the proposed roof. Testimony presented to the hearing examiner was that the modification would be consistent with the purpose behind the roof pitch regulations. McEnery stated that the purpose behind the Deer Harbor roof pitch requirements is visual. She pointed to SJCC 18.10.020, which provides that one of the purposes of the Title 18 regulations is aesthetic: "To provide for the economic, social, and aesthetic advantages of orderly development through harmonious groupings of compatible and complementary land uses and the application of appropriate development standards . . ." SJCC 18.10.020(B)(4). McEnery explained the dominant visual impression from the ground would be that of a roof with a 4:12 pitch.[17]

Durland points to no authority to show that roof pitch for the type of roof proposed by Heinmiller must be measured differently, i.e., from the center-most

---

[17] Architectural designer Bonnie Ward also testified that the modified roof would have a 4:12 pitch despite having a flattened portion on top, as the flat portion would constitute less than ten percent of the roof and would not be noticeable from the exterior.

18

point of the roof. He presented no expert testimony to the hearing examiner as to why the proposed roof cannot properly be determined to have a 4:12 pitch.

*ADU's Compliance with SJCC "Living Area" Restriction*

Heinmiller cross-appeals the superior court's ruling that the County erroneously computed the ADU's living area where the SJCC definition of "living area" was unambiguous and did not allow exclusion of areas with a ceiling height less than five feet. This issue involves SJCC 18.40.240(F) and 18.20.120. The former provides that an ADU "permitted subsequent to the adoption of this section shall not exceed 1,000 square feet in living area as defined in SJCC 18.20.120." The latter defines "Living Area" as "the internal space measured from the interior of the exterior walls, excluding decks, overhangs, unenclosed porches or unheated enclosed porches, and the stairwell on one level of a two-story structure."

Here, the County found that Heinmiller's ADU was 955 square feet in living area. The County's calculation excluded areas where the ceiling height was less than five feet.[18] San Juan County Community Development and Planning Department director and chief building official Rene Beliveau testified before the hearing examiner that because the SJCC was silent as to measuring living area in a structure with a sloped roof, the County consulted the International Residential Code (IRC). The hearing examiner agreed with the County,

---

[18] Implicit in the parties' dispute is the conclusion that, had those areas been included in calculating the size of the ADU, the square-foot limit would not have been met.

reasoning that interpreting SJCC 18.20.120 to include such areas would lead to absurd or strained results.

Durland argues that SJCC 18.20.120 and 18.20.240(F) are unambiguous and do not permit the subject areas to be excluded. Heinmiller argues that RCW 19.27.031 imposes a mandatory duty on the County to apply provisions of the IRC in considering whether to issue a building permit. He contends that disregarding IRC provisions would lead to absurd results and that the County's interpretation is entitled to deference.

We agree with Durland and hold that SJCC 18.20.120 does not allow the exclusion of areas with a ceiling height under five feet from the living area measurement. Initially, the parties agree that the state building code generally applies to the County and its interpretation of the SJCC. See RCW 19.27.031 ("Except as otherwise provided in this chapter," International Building Code and IRC "shall be in effect in all counties"), SJCC 18.20.005(B) (SJCC definitions referencing UBC intended to mirror UBC definitions), SJCC 15.04.050(B) (IRC adopted "as if fully set out in this article"). For several reasons, however, IRC provisions do not apply in interpreting SJCC 18.40.240(F) or SJCC 18.20.120.

First, the SJCC provisions are unambiguous. SJCC 18.40.240(F) limits the size of an ADU to 1,000 square feet of "living area," as that term is defined in SJCC 18.20.120. SJCC 18.20.120 sets forth areas to exclude from the living area calculation (decks, etc.), none of which is "areas with a ceiling height of five feet or less." This unambiguous language cannot be supplemented by other

definitions. Unambiguous statutes are not subject to interpretation; one looks at the plain language of the statute without considering outside sources. State v. Delgado, 148 Wn.2d 723, 727, 63 P.3d 792 (2003). Furthermore, when the legislature has defined a term by statute, that definition controls its interpretation. State v. Watson, 146 Wn.2d 947, 954, 51 P.3d 66 (2002). Words cannot be added to an unambiguous statute when the legislative body has not included that language. Davis v. State Dep't of Licensing, 137 Wn.2d 957, 964, 977 P.2d 554 (1999).

Second, the SJCC provisions at issue do not reference state law definitions. SJCC 18.20.005(B) provides:

> All definitions which reference the Revised Code of Washington (RCW), Washington Administrative Code (WAC), and Uniform Building Code (UBC) are intended to mirror the definitions in these codes at the effective date of the Unified Development Code (this code) or as amended. If the definition in this code conflicts with a definition under state law or regulation, the state definition shall control over this definition.

But neither SJCC 18.40.240(F) nor SJCC 18.20.120 references any definition in the RCW, WAC, or UBC, and the definition of "living area" under SJCC 18.20.120 does not conflict with any state law definitions.

Furthermore, while Heinmiller argues that the IRC and SJCC provisions reference the same subject matter and should be harmonized, we disagree that they reference the same subject matter. The IRC provisions that Heinmiller

21

contends were properly considered by the County in excluding the subject areas

are IRC 305.1 (2003) and IRC 202 (2003).[19] IRC 305.1 states, in pertinent part:

> Habitable rooms, hallways, corridors, bathrooms, toilet rooms,
> laundry rooms and basements shall have a ceiling height of not
> less than 7 feet (2134 mm).
> The required height shall be measured from the finish floor to the
> lowest projection from the ceiling.
>> Exceptions:
>>
>> ...
>>
>> 3. Not more than 50 percent of the required floor area of a room or
>> space is permitted to have a sloped ceiling less than 7 feet (2134
>> mm) in height with no portion of the required floor area less than 5
>> feet (1524 mm) in height.

IRC 202 defines "habitable space" as: "A space in a building for living, sleeping,

eating or cooking. Bathrooms, toilet rooms, closets, halls, storage or utility

spaces and similar areas are not considered habitable spaces." IRC 202 defines

"living space" as "[s]pace within a dwelling unit utilized for living, sleeping, eating,

cooking, bathing, washing and sanitation purposes." None of these IRC

provisions pertain to the specific matter of measuring the living area of an ADU

for the purpose of limiting the ADU's size. Nor do they use the same terminology;

where the SJCC provision limits an ADU's "living area," the IRC definitions refer

to "habitable space" and "living space."

Finally, Heinmiller contends applying a literal interpretation of SJCC

18.20.120, without reference to the IRC, would lead to absurd results because it

would allow for the inclusion of areas that have no utility as living space. But the

---

[19] These provisions are part of the "2003 International Residential Code for One- and Two-Family Dwellings." CP at 170-71.

absurd results canon of statutory construction is applied sparingly. Five Corners Family Farmers v. State, 173 Wn.2d 296, 311, 268 P.3d 892 (2011) (citing Duke v. Boyd, 133 Wn.2d 80, 87, 942 P.2d 351 (1997)). Moreover, it is not clear that such an interpretation leads to absurd results. A property owner chooses where and how to build an ADU; it does not seem absurd to expect him or her to be aware of SJCC requirements when planning an ADU. Heinmiller also argues that Durland's interpretation would lead to the absurd result that all interior space of any structure in which an ADU is situated would count toward living area, in addition to the square footage of the ADU itself. He points out that the SJCC envisions that an ADU may be only part of a structure, such as a garage. See SJCC 18.20.010 (ADU may be "internal, attached or detached"). That issue is not presented here. Moreover, the SJCC 18.40.240(F) definition presumes that the living area of the ADU is being measured ("An accessory dwelling unit . . . shall not exceed . . .), not the entire building in which the ADU is located.

Deference to the County's interpretation of its code depends on whether the provision is ambiguous; absent ambiguity, there is no need for the County's expertise in construing its regulations. Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 813-14, 828 P.2d 549 (1992). The SJCC provisions limiting an ADU's living area are not ambiguous.

*Superior Court's Award of Costs to Durland*

Heinmiller seeks reversal of the superior court's award of statutory costs to Durland under RCW 4.84.010. This court reviews an award of attorney's fees

23

and costs for abuse of discretion. <u>Ernst Home Center, Inc. v. Sato</u>, 80 Wn. App. 473, 490, 910 P.2d 486 (1996). "The determination as to who substantially prevails turns on the substance of the relief which is accorded the parties." <u>Marine Enterprises, Inc. v. Security Pacific Trading Corp.</u>, 50 Wn. App. 768, 772, 750 P.2d 1290 (1988). The prevailing party need not prevail on the entire claim. <u>Silverdale Hotel Assocs. v. Lomas & Nettleton Co.</u>, 36 Wn. App. 762, 774, 677 P.2d 773 (1984).

Heinmiller contends Durland was not the prevailing party because he prevailed only on the living area issue. He contends that the court's ruling, furthermore, did not destroy his ability to maintain the ADU because he can pursue planning revisions with the County and reconfigure the ADU's size.

We conclude the superior court did not abuse its discretion. Durland succeeded in the sense that he halted Heinmiller's plan to maintain the ADU by invalidating the ADU permit. The superior court ruled that the ADU was not in conformance with the SJCC because of the living area and remanded the matter to establish compliance with SJCC 18.20.120. At this point it is uncertain whether Heinmiller will be able to maintain the ADU.

*Heinmiller's Request for Attorney's Fees on Appeal*

Heinmiller seeks attorney's fees on appeal under RCW 4.84.370, which in a land use decision "allows reasonable attorneys fees to a party who prevails or substantially prevails at the local government level, the superior court level, and before the court of appeals or the supreme court." <u>Julian v. City of Vancouver,</u>

No. 67429-3-I/25

161 Wn. App. 614, 631-32, 255 P.3d 763 (2011). We deny the request. Heinmiller did not substantially prevail before the superior court and he does not substantially prevail on appeal.

*Conclusion*

We affirm the superior court's rulings on the roof pitch and living area issues, as well as its award of statutory costs to Durland, but reverse its ruling that the compliance plans in this case were land use decisions under LUPA. We remand to the hearing examiner for consideration of the issues previously determined to be barred along with any other issues yet to be determined.

Reversed in part, affirmed in part, and remanded to hearing examiner for further proceedings.

_Spearman, A.C.J._

WE CONCUR:

_Dwyer, J._                    _Schindler, J._

25